96 N.J. Super. 483 (1967)
233 A.2d 395
DOROTHY M. FEDER, PLAINTIFF,
v.
BANKERS NATIONAL LIFE INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 19, 1967.
*484 Mr. Allan Maitlin for plaintiff (Messrs. Feuerstein and Sachs, attorneys).
Mr. Roger McGlynn for defendant (Messrs. McGlynn, Stein & Eberiel, attorneys).
STAMLER, J.S.C.
Plaintiff Dorothy M. Feder sues for the proceeds of a life insurance policy issued by defendant Bankers National Life Insurance Co. upon the life of her deceased husband David Feder. The policy issued and was dated June 4, 1962 for the face amount of $50,000. The annual premiums were $854.40 and the insured elected to pay the premiums on a monthly basis of $77 each. The initial June and July 4 premiums were paid by the insured but the premium due August 4 was not paid. Under the standard nonforfeiture provisions of the policy the insured was entitled to a grace period for payment of the overdue premium of 31 days, during which time the policy would remain in force. Paragraph 2 of the policy relating to the grace period provides:
"In the payment of any annual premium or installment thereof under this policy, except the first, a grace of 31 days will be allowed, during which time the policy will remain in force."
On September 5 the grace period expired. On September 11, 1962 the insured executed a written application for reinstatement of the policy which was submitted to the company, together with two monthly premium payments on September 24, representing the monthly payments due in *485 August and September. Following investigation the company approved of reinstatement of the policy on September 24, 1962. The subsequent premium for October was not paid, and again pursuant to the grace period provisions of the contract, the insured was permitted 31 days to make payment of that premium. The insured died on November 10, 1962.
The foregoing represents agreed facts. Only two factual determinations were required to be submitted to the jury.
Plaintiff contended that on November 7, 1962 (three days before death) the insured paid in cash $77 (the monthly premium charge) to defendant through its agent, and that acceptance of the premium constituted a waiver by defendant. Defendant denied that any such payment was made, and the jury agreed. There is therefore no substance to this contention of plaintiff.
Plaintiff then takes the position that the premium payment made on September 24 created a new premium period and that subsequent premiums were not due on the fourth of each month. She argues that the payment made on that date was for the period September 24 to October 24 and therefor the grace period would have terminated on November 24. Accordingly, it is urged that the assured's death on November 10 occurred within the grace period. Relying for the most part on cases treating with accident and health policies, plaintiff states that the company cannot claim a premium for any period of time in which no coverage is afforded. These contentions implicitly contain the acknowledged rule that no contractual obligation is supportable without underlying consideration.
The question then is: Does the acceptance on September 24 of the reinstatement application and premium create a new and different contract or is it the revival of the old.
Plaintiff contends that it is a new contract, with September 24 as its premium date. Defendant asserts that it is a reinstatement of the old contract, the premium date of which is fixed at September 4.
*486 The authorities support defendant's view. The following relevant language is found in 3A, Appleman, Insurance Law and Practice, § 1971, p. 700 (1967):
"It has been held that a reinstatement can only be brought about by a valid contract between the parties. To this end, there must be a meeting of minds of the parties, application and acceptance, valid consideration, and full knowledge of the circumstances under which the application is made and the money paid. Under this rule, the parties have the right to fix the terms of such reinstatement.
The foregoing rule concerns the contract governing the reinstatement, which contract has its inception when the insured applies for reinstatement and its termination upon the acceptance by the insurer of that application. The question logically arises, then, as to whether the new policy is itself a different contract, a continuation of the intermediate contract, or a revival of the old.
On this point, no case seems to hold that the intermediate contract, that is, the contract inducing the reinstatement, continues. There is a division of authority, however, upon the question as to whether the old contract is thereby automatically revived. A few courts have held that a new contract of insurance is thereby created, containing new warranties, new conditions, and the like, just as if no prior policy had ever existed. This is definitely a minority holding. The overwhelming majority of courts hold that the old contract is thereby reinstated and revived, and the new policy is merely a continuation of the old coverage."
As noted, most of the cases cited by plaintiff deal with reinstatement of accident or health policies. It is clear that life insurance policies must fall into a different category. A reinstated life policy continues at the same premium rate, instead of increasing to the age at which insurance is reinstated; the incontestability clauses and suicide provisions run from the earlier date; the cash surrender and loan value are reached at an earlier date; paid-up extended term options are sooner reached. There can be no doubt about the essential and important equities and reservations of right in a life policy over and beyond those of a reinstated accident and health policy. Cf. Kampf v. Franklin Life Ins. Co., 33 N.J. 36 (1960), where the court stressed the importance of the "birth" date of a life policy and the advantages of an earlier "birth" date.
*487 In Acacia Mutual Life Ass'n v. Kaul, 114 N.J. Eq. 491 (Ch. 1933), the court said:
"The reinstatement of the policy was not the issuance of a new policy nor the reissuance of the original policy. It was the waiver of the lapse of the original policy, and the reinstatement of that policy in full force and effect according to its terms, all its terms. One of those terms is the incontestability clause. No contest can be made therefore on the original policy itself * * *" (at p. 492)
This language was directed to the insurer's claim, in its action for rescission of the policy, of fraudulent misrepresentations inducing the original insurance of the policy. (Rescission was granted in the case of the reinstatement contract and judgment rendered for the insurer). The above quotation is set forth for its reference to "all the terms" of an insurance contract being given full effect upon reinstatement.
The case of New York Life Ins. Co. v. Weiss, 133 N.J. Eq. 375 (E. & A. 1943), cited in the briefs of both parties, was a suit by the insurer to cancel and rescind a life insurance policy for fraudulent representations. Insofar as it is relevant at all, it stands only for the proposition that reinstatement is a contract separate and distinct from the original contract of insurance.
A foreign decision very similar to, if not indistinguishable from, the present case is Travelers Protective Ass'n of America v. Ziegler, 250 S.W. 1115 (Tex. Cir. App. 1923). The insured in that case paid his last premium on January 15, 1921, covering the six months ending on June 30, 1921. The "dues" for the next six-month period should have been paid on or before June 30 to avoid the lapse which occurred by virtue of the Association's by-laws. The insured died on July 2, 1921.
"It [was] the contention of appellee that, as deceased was reinstated on January 15, 1921, and on that date paid the semi-annual dues of $5.50, he had fully paid up to July 15, and consequently was not in arrears for dues when he was killed on July 2." (at p. 1116)
*488 In answer the court said:
"Under that contention deceased suffered no penalty whatever for becoming delinquent, but could by becoming delinquent at the end of each successive 6 months gain nearly a month free from dues and return to the fold." (at p. 1117)
It must therefore be concluded that notwithstanding the reinstatement, the original premium dates and policy dates remained and that the grace period had expired five days before death.
Plaintiff next contends that when the insurance agent assisted the widow in the completion of a "proof of death" or "proof of claim" form at the funeral parlor, the widow did not understand its limiting statement and therefore the insurance company waived its right to claim that the policy had lapsed, or is estopped from denying its validity. The proof of claim contained the following language:
"* * * I (we) understand that the furnishing of forms by the company does not constitute an admission that there is any insurance in force."
Directed to this statement, a special interrogatory was submitted to the jury:
"Was the form of the Proof of Claim which Mrs. Feder signed understandable to the person of average intelligence under the circumstances of the case, so that such person would realize that the insurance company did not admit that there was insurance in force?"
The jury answered in the negative. Plaintiff contends that this response in and of itself gave rise to a waiver or estoppel so as to preclude defendant from arguing that the policy had lapsed.
The trial was devoid of any proof that the widow did more than sign her name to the proof of claim. She made no expenditure in investigating the nature of the death or in proving a point of questioned contestability. Yet she *489 seeks to advance waiver or estoppel by the limited act of completing and signing the proof of loss.
In each of the cases relied upon by plaintiff the insurance company intentionally and purposefully placed the beneficiary in the position of spending time and money in preparing to pursue the claim. There is no such proof in this case.
It is stretching the bow string to its most taut position to assert that by merely receiving and passing on the proof of death of the insured while the policy was lapsed and not in effect, the insurer intended to waive the payment of premium and the lapse of the policy. See Grand Lodge Colored Knights of Pythias v. Preston, 91 S.W.2d 496 (Tex. Civ. App. 1936).
Both parties cite 5 Cooley's Briefs on Insurance 2d, the plaintiff to page 4473, and defendant to page 4450. The relevant discussion however begins at page 4448:
"It is a general rule that where the company, with knowledge of a breach of condition or warranty, requires the insured after a loss to furnish proofs, or to furnish additional proofs, it will be held to have waived its rights to insist on the defense arising out of such breach. The theory is that the proofs are of no benefit or use unless there is an intention to pay the loss notwithstanding the breach, and therefore a demand for them is equivalent to a declaration of such intention, which the company is not at liberty to withdraw after the insured has gone to the trouble and expense of complying with the request." (Emphasis supplied)
And at page 4450:
"The mere furnishing of blanks for making proof of loss is insufficient to effect a waiver (Alspaugh v. British American Ins. Co., 121 N.C. 290, 28 S.E. 415), but in connection with other facts, as by treating the policy as valid after knowledge of the facts, may operate as a waiver, though the blanks contain a nonwaiver provision * * *"
Even assuming that this last assertion conflicts with Cooley's "general rule," other portions of the discussion support the existence and validity of the latter. At page 4452 is found:
*490 "It is not easy to reconcile all the cases dealing with the effect of a denial of liability or of waiver by the company at the time of the demand for proofs. The authorities, however, support the proposition that where insured, at the request or demand of the company, is put to trouble or expense in the production of proofs of loss, a waiver of a breach of warranty or condition known to the company will arise, though the demand or request is accompanied by a general statement that no waiver of any right of the company is intended." (Emphasis supplied)
The following is found at page 4473:
"The same general principles determine in the case of inducing proofs of death or injury under a life or an accident policy as in the case of requiring proofs of loss under a property policy. If the company, with knowledge of a breach of warranty or condition, induces the beneficiary to go to trouble or expense in making proofs of death, the breach will be waived."
Further, the Alspaugh case, supra, which was Cooley's authority for the assertion that mere furnishing of proof of loss forms is insufficient to effect a waiver, involved a situation where the insurer's adjuster, upon visiting the scene of the fire, was informed of a breach of condition in the use of the insured building and as a "personal favor" to plaintiff's attorney furnished him with blank proof of loss forms. Plaintiff claimed that this act, along with others not here relevant, performed on behalf of the insurer gave rise to the waiver. Without any discussion whatsoever of the effect on the question of furnishing proof of loss forms, the court held that a waiver had not been established.
Thus, up to this point the law, as outlined by Cooley is that an insurer may be found to have waived a breach of condition or warranty by causing an insured to furnish proofs of loss, if at the time of so doing it has knowledge of the breach and if trouble or expense to the insured thereby results.
Plaintiff cites a number of cases in which this rule or one substantially similar was applied. Defendant answers *491 that none of these cases, however, establishes the proposition that furnishing a proof of loss to a claimant per se creates a waiver; and it further asserts that in those cases where a waiver or forfeiture was found, there were present facts and circumstances additional to the execution of proofs of loss. There was no proof in this case that defendant was aware of the lapsed condition of the policy and of the expiration of the grace period.
In support of her position plaintiff relies on Titus v. Glens Falls Insurance Co., 81 N.Y. 410 (Ct. App. 1880); Martin v. State Insurance Co., 44 N.J.L. 485, 486 (Sup. Ct. 1882); Kissinger v. North American Union Life Assurance Society, 108 N.J.L. 405 (E. & A. 1931); Graham v. Security Mutual Life Ins. Co., 72 N.J.L. 298 (E. & A. 1905); Southern Traveler's Ass'n v. Masterson, 48 S.W.2d 771 (Tex. Civ. App. 1932); Burnham v. Interstate Casualty Co. of N.Y., 117 Mich. 142, 75 N.W. 445 (Mich. Sup. Ct. 1898); Grand Lodge Colored Knights of Pythias of Texas v. Green, 69 S.W.2d 149 (Tex. Civ. App. 1934); Garvin v. Union Mutual Life Insurance Co., 231 Mo. App. 904, 79 S.W.2d 496 (Mo. App. 1935). These cases are distinguishable:
Titus dealt with a fire insurance policy, where the court found waiver by the insurer because the company had subjected the claimant to a rigorous inquisitorial examination, then recognized the validity of the policy, and then with knowledge permitted claimant to expend monies in preparation of presentation of the claim.
Martin was also a fire policy case, where the insurance company actively negotiated settlement from immediately after the fire until suit was instituted, at which point it interposed the defense that the action was brought too late.
Kissinger reaches the same result, with the added feature of assessment of back premiums after death.
In Graham the insurance company accepted and retained a promissory note of the insured and considered it a live *492 obligation of the decedent. The jury there found no lapse in payment.
Somewhat more to the point is the Southern Traveler's Ass'n case, where the policy provided for sick benefits resulting from described diseases. The insured failed to pay a premium assessment by the final due date of May 31, 1927. Payment was made, however, on June 8, 1927 and accepted by the Association. The insured then became ill on June 19, 1927 and so remained continuously until he died in 1929. Among other claims, the Association asserted that the insured was not a member in good standing of the Association at the onset of his illness, as required by its by-laws, by virtue of his failure timely to satisfy the premium call. The court found a waiver of strict compliance with the by-law requiring payment of premiums within 30 days after assessment, as well as estoppel to insist upon the forfeiture. Its reasons for the former holding were:
"The record also discloses that subsequent to the date defendant is now contending that insured's membership lapsed  that is, 12 o'clock noon 30 days after May 1, 1927  additional calls were made by defendant upon insured for premiums, were collected and retained, that is, defendant not only collected and retained the premium a few days after the expiration of the 30 days from May 1, 1927, but with full knowledge of the fact that said premium had not been paid within the 30-day period, on August 2, 1927, levied another assessment upon insured, which was paid by him and retained by defendant. The record further discloses that, during insured's membership, which began in 1922, defendant made twenty-nine calls upon him for premiums, twelve of which were paid after the expiration of the 30-day period, and only eight were paid within said period, but, without exception, these premiums were retained, no forfeiture was declared, and nothing was said or done indicating that defendant would insist upon a literal compliance with the terms of the by-laws. Again, on June 19, 1927, being notified of the illness of insured and recognizing the continuing validity of the contract, defendant furnished insured with necessary blanks and required him to furnish both the preliminary and final reports of himself and attending physician, heretofore mentioned.
In view of these undisputed facts, we are of opinion that defendant, not only waived the provisions of its by-laws here invoked to defeat recovery, but is estopped to claim forfeiture." (at p. 775)
*493 The grounds for the finding of estoppel were:
"On the question of estoppel, the doctrine is well established that, where, with knowledge of the ground of forfeiture, the insurer by any negotiations or transactions recognizes the continued validity of the policy, or required the insured by virtue of the contract to take action or incur trouble or expense, estoppel arises preventing forfeiture, and, under such circumstances, forfeiture is waived as a matter of law." (at p. 776)
In Burnham, supra, the insurance policy was in the amount of $5,000 for accidental death and contained a warranty that the insured would notify the company of any additional such insurance applied for or obtained. The insured in fact obtained additional insurance without furnishing the requisite notification, the company learning of the breach only upon an investigation conducted after the fatal accident. Approximately a month after the insured's death the beneficiary's attorney wrote the insurer, informing it of the accident and requesting proof of death forms. The company answered that it did not understand how the beneficiary could prove accidental death (there was a question of suicide in the case) but would forward the requested blanks "subject to the notices and stipulations printed thereon." The blanks contained an indorsement that the company, by furnishing them, waived no rights available to it. This letter was dated September 25, 1896. On November 20, 1896, the executed proofs of loss apparently having been received and not containing a reference to the additional insurance, the company wrote the beneficiary that it relied on the breach and denied liability under the policy. In the subsequent suit it was contended that the company by these actions had waived its right to assert the breach. In a 3-2 ruling, the majority of the Michigan Supreme Court agreed. It held that upon receiving the letter from the beneficiary's attorney requesting proof forms, "good faith required that, if the company expected to rely upon a defense which would render proofs of loss wholly unavailing, *494 notice of this fact should [have been] given promptly, inasmuch as it was made apparent by Mr. Babcock's letter that the assured would otherwise be put to expense in the preparation of proofs of loss." (75 N.W., at p. 449). Although the dissent stated that there was no proof in the case that the beneficiary incurred expense in completing the proofs, the majority opinion relied heavily upon such a theory:
"[I]n my judgment the time for the company to determine that question was when it was made known to it that the withholding of such claims of defense, and the furnishing of blanks, would be likely to result in expense to the assured. Having failed to disclose the defense at that time, and having permitted the assured to incur this expense, the defense should be deemed waived. (citing cases) The general statement appended to the blank proof of loss, reserving a right to insist upon a breach of conditions, should not be held to reserve a defense known to the company at that time. (citing cases) Nor do I think that the fact that the information that Mr. Winans had other insurance was not derived from the beneficiaries affects the question. It is knowledge of the fact, and the action of the company, requiring the beneficiaries to incur expense, which renders it an act of bad faith to thereafter seek to avoid the policy."
In a later Michigan decision, Showalter v. Modern Woodmen of America, 156 Mich. 390, 120 N.W. 994 (Sup. Ct. 1909), the by-laws of the association prohibited an insured member from engaging in the occupation of railroad brakeman, which Showalter became after obtaining his certificate of life insurance. This breach, relieving the insurer of liability, was claimed to have been waived. The evidence showed that the clerk of the "local camp" had actual knowledge of the insured's occupation but nevertheless accepted and retained premium payments. The waiver, it was contended, consisted in this behavior of the clerk and the failure of the home office, upon learning of the breach after the insured's death, to return the premiums to decedent's representative, thereby ratifying the actions of the clerk. In disallowing this contention the court found that "No act of the assured was induced by any nonaction on the part of the Great Camp." It reasoned further, after noting that a *495 "social feature" was "connected with the organization," that even if "all the notice [of] the clerk of the Wyandotte Camp [had] been brought home to the Great Camp, they would still have the right to assume that the payments of dues were for the benefits which were still open to the assured notwithstanding his engaging in an employment named in rule 14." (at p. 995).
The plaintiff in Showalter contended, in the alternative, that the association waived the breach by accepting proofs of death with knowledge of the facts giving rise thereto, placing reliance on Burnham. In addition to a letter from the home office to the clerk of the local camp, directing the latter not to assist in executing death proofs "unless called upon to furnish evidence in your official capacity as camp clerk only," the following correspondence was in evidence: a letter from plaintiff's attorneys to the home office attempting to learn if there was an objection to the claim and whether proof of death had been properly made; the response from the association stating the breach and that death proofs had not been filed; another letter from the same attorneys requesting blank proofs of death and the response thereto supplying the forms, but reiterating the association's denial of liability. The court held that plaintiff was not "misled and induced by this correspondence to incur expense," and that there was no element of estoppel. Again referring to the above described correspondence, the court said:
"The case is clearly distinguishable from Burnham v. Inter State Casualty Co. In that case a distinct ground of defense was foreshadowed in the communication. The language of the communication was: `Although we do not understand how you are going to affirmatively prove accidental death in this case, under the circumstances, yet we will comply with your request, and forward the blanks as requested, subject to the notices and stipulations printed thereon.' It was contended in that case that as to the question of whether there was accidental death there had been no waiver, but the effort was to set up another entirely distinct defense. In the present case there has been no waivering as to the nature of the defense to this claim. The very first communication of the company to its subordinate, the clerk of the local camp, as well as the first communication *496 to Messrs. Bird & Sampson, stated with definiteness what the nature of the defense was, and the last communication again denied liability, but gave the privilege of presenting proofs of death to the society's board of directors if they saw fit to do so. No one could read this letter and understand that these proofs of death were furnished on any other assumption than at the option of the representatives of Mrs. Showalter, and that, in doing so, they would take their chances on convincing the directors of some legal or equitable claim against the company." (at p. 996)
Plaintiff relies extensively upon Grand Lodge Colored Knights of Pythias of Texas v. Green, 69 S.W.2d 149 (Tex. Civ. App. 1934). In that case the by-laws of the fraternal benefit association provided that dues became available on the first of each quarterly month, i.e., January, April, July and October, and that if not paid on or before the first day of the following month the member became suspended. Reinstatement could be obtained only by paying, in the first month of the next succeeding quarter, the arrearages and the dues for that quarter. Green, the insured, failed to pay the premium of $3.35 due January 1, 1932. Early in March 1932 his wife attempted to pay this premium, but was informed by the association that it could not accept the premium until April 1932. Green died in late March, 1932. In April plaintiff's attorneys filed proof of death, but not on forms provided by the association. The grand keeper of records and seals responded to counsel in relevant part as follows:
"I find that John Green at the time of his death was not financial with this Department and therefore his beneficiary would not be entitled to any benefits by reason of his death. Possibly this is the reason the lodge made no request for a death proof blank on which to report his death to this Department. However, they should not have refused to report the death and I am therefore sending you herewith enclosed a blank proof of death, which when properly executed and filed with this office will have due consideration of the Endowment Board and their decision with respect to the proof as filed."
This case is readily distinguishable because the payment of the premium was offered or tendered to the insurance *497 company, the company indicating that it would accept it at a later date, and death intervened.
In Grand Lodge Colored Knights of Pythias of Texas v. Green, 128 Tex. 593, 101 S.W.2d 219 (Tex. Comm'n of App. 1937), the opinion of the Commissioner being adopted by the Texas Supreme Court, a writ of error was dismissed. The Texas Supreme Court could have obtained jurisdiction only if a conflict was shown between the decision sought to be reviewed and other decisions on the same level, or between the former and a decision of the Supreme Court. It was held that a sufficient distinction of Green from a Supreme Court decision negating waiver, consisted in the absence from the proof forms, the by-laws and policy of an assertion that furnishing such forms would not constitute a waiver. The policy involved in the prior Supreme Court decision provided against a waiver founded upon the insurer's conducting an examination or proceedings toward effecting appraisal. This action was nothing more, in effect, than the denial of certification or certiorari. Green was decided solely on the separate and distinguishing facts in that specific case.
Green was relied upon in Grand Lodge Colored Knights of Pythias v. Preston, 91 S.W.2d 496 (Tex. Civ. App. 1936). In that no attempt was made to pay the delinquent premium before the insured's death, nor had all premiums on the policy been paid for 12 years before the default, as they had in Green. In Preston the "commander" of the local lodge had been requested by a cousin of the plaintiff to visit her concerning the insurance. Upon doing so he prevailed upon her to remain in Galveston for a few days, instead of returning to her home in Port Arthur, during which time he had her execute proofs of death. Holding that no waiver occurred, the court said:
"Proof of death, in connection with an insurance policy, is but an evidentiary matter necessary to show liability  a cause of action on the policy. The proof of death is not the cause of action, but merely one step in the evidence necessary to enforce the liability of the insurer after the death of the insured." (at p. 498)
*498 And further:
"Where an insurance society, as here, has received only three quarterly premiums on a policy, and the policy has lapsed for failure to pay other premiums, we cannot think that, by merely receiving and passing upon proof of death of the insured while the policy was lapsed and not in effect, it could reasonably be inferred that the insurer intended to waive the payment of the premium and the lapsing of the policy * * *"
The Green case was distinguished principally on the factual differences noted above.
The mere submission of a proof of loss form to an insured or beneficiary without a detrimental change in the beneficiary's position does not bring about a waiver or estoppel.
In Orr v. Mutual Life Ins. Co. of New York, 64 F.2d 561 (8 Cir. 1933), the policy contained disability and waiver of premium provisions of which the insured was ignorant when he became totally disabled on April 27, 1925. Also according to the policy, however, benefits would not accrue under those provisions until proof was furnished to and approved by the company. Such proof was not furnished until early November 1931, request for the forms having been made on September 25, 1931. The insured believed himself entitled to benefits for the entire period from April 1925 to November 1931. The insurer denied such an extensive liability, relying on the policy provisions to when benefits were to take effect. In the subsequent suit the insured claimed the company had waived or was estopped from asserting these provisions. The court quoted the following language from his brief:
"By putting plaintiff to the trouble and expense of furnishing proof of disability covering the full period of disability, after knowledge that the disability had lasted for six and a half years, and by accepting the proof without objection and by approving the same as satisfactory, the defendant waived its alleged right to insist on proof as a condition precedent to the accrual of benefits for that period of time. By its independent investigation through its own medical department and investigator it established the fact to its own satisfaction *499 that plaintiff's claimed total disability was genuine, and had persisted for six and a half years. On the strength of the facts shown by the proof of disability and its own examinations, the defendant entered into an attempted adjustment of plaintiff's claim, and tendered him benefits for the last eleven months of disability prior to the furnishing of proof. These acts and conduct on defendant's part operated as a clear waiver of its alleged right to insist on the furnishing of proof as a condition precedent.
And granting (in the absence of a policy requirement that proof shall be furnished within a specified time) the plaintiff was required to furnish proof within a reasonable time after disability began, then we contend that by its aforesaid conduct defendant also waived the delay in furnishing proof and is estopped now to say the proof was furnished after a reasonable time." (Emphasis supplied)
It was then held that there was nothing in the acts and expressions of the insurer to indicate an intention on its part to waive the limitations on the disability and waiver of premium provisions. To the same effect see Columbian National Life Ins. Co. v. Morey, 26 F.2d 580 (1 Cir. 1928).
In Ronald v. Mutual Reserve Fund Life Ass'n, 7 N.Y.S. 152 (Cir. Ct. 1889), affirmed on opinion below, 57 Hun 592, 10 N.Y.S. 632 (Sup. Ct. 1890), affirmed 132 N.Y. 378, 30 N.E. 739 (Ct. App. 1892), a life policy lapsed for failure to pay premium. The premium was then paid after the due date but the receipt given therefor stated that reinstatement would not be allowed unless the insured was in the same good health as when the policy issued. The insured was, in fact, sick and died the day after this payment. Such fact had not been disclosed when payment was made. The company requested proofs of death and gave instructions on how to fill them out. The plaintiff contended that this behavior evidenced an estoppel. The court there said:
"In my judgment this request and these instructions did not amount to a waiver of an existing forfeiture. The plaintiff was not thereby misled to her prejudice. Her rights depended upon the fact existing at the death of her husband. The question of waiver might subsequently arise with respect to conditions as to the proofs of death, but the insurer is not bound to abandon its claim of forfeiture if it would insist upon a compliance with the terms of the policy as to the proof of death. The case of Insurance Co. v. Stevenson, 8 Ins. Law J. 922, is in point. The principle which I have *500 stated was there maintained by the court of appeals of Kentucky, and the learned editor of the journal adds a very copious and instructive note, citing all the cases upon the subject, and making the following clear and correct statement of the results: `If the mere demand for formal proof of loss, with a knowledge that the insured had violated a policy stipulation, were liable to operate as a waiver of such stipulation, it would follow that the insurer must surrender his right to demand such proof, if he would avail himself of the breach; or, at any rate, he could not safely demand proof without at the same time being careful to notify the insured of his proposed future line of defense.'" (at p. 153)
That the jury found that plaintiff failed to understand the limiting or nonconcession clauses in the proof of death can add no substantive legal or equitable rights. Had there been proof that the insurance company was aware of the expiration of the grace period and that plaintiff assumed the existence of a valid policy when the agent presented her with the "Proof of Death" form, and had she thereafter and in reliance thereon spent considerable time and money in preparing to prove her most beneficial position, the result might be different.
Not one iota of proof was adduced in this case to show that plaintiff was mislead and acted to her personal detriment because of any misrepresentation.
The ineluctable conclusion is that on all contentions plaintiff has failed to demonstrate her right to recover on the lapsed policy.
A judgment of no cause for action will be entered against plaintiff. Defendant is directed to submit a form of judgment in conformity with this opinion within ten days, consented to as to form or settled upon notice.